By the Court—Monell, J.
The only question in this case not disposed of by the Court of Appeals, (21 K. Y. B., 386,) is whether the sale of the flour was made by the defendants in good faith, after the exercise of that prudence and skill which agents to whom the property of others is intrusted are always obliged to employ. Whether the defendants violated the written instructions of the plaintiffs is res adjudicata.
Upon the facts presented to the Court of Appeals, that Court held, that the evidence did not establish bad faith or want of skill or prudence on the part of the defendants ; on the contrary, “ that there was not the slightest reason on the evidence to impute blame to the defendants, and that there was nothing for the Jury to deliberate upon.”
Unless upon the last trial, the plaintiffs have varied the facts, and shown by additional evidence that blame was imputable to the defendants, the Justice committed no error in dismissing the complaint.
The new and additional facts relied on by the plaintiffs, as furnishing evidence of bad faith or want of prudence on the part of the defendants, are: that the flour when shipped at Kew Orleans was sweet and in good condition; that from ten to twenty barrels of it were examined about the 1st of September, by one of the plaintiffs, in Liverpool, and found to be sound, sweet and in good condition; that a newspaper, called “ Wilmer & Smith’s European Times,” published in London, was taken by the defendants’ firm, and that an article appeared therein, under date of July 25, 1846, which spoke of the appearance of the potato disease in Ireland, and of rumors of its appearance in England and on the continent.
Mr. Wood, one of the defendants, testified in respect to the newspaper, that it was not considered authority, and was not read by him. There was no evidence that it was ever seen or read by any other member of the firm.
If it was material, as bearing upon the question of good or bad faith on the part of the defendants, whether the flour was sweet or sour, or heated, or was “ a damaged *392 article,” there*was probably sufficient conflict of evidence on that subject to have made it proper to have submitted it to the Jury. But in the view taken by the Court of Appeals, and the view which I take of the effect to be given to the new evidence furnished by the plaintiffs, it does not become a material inquiry whether the. flour, on its arrival at Liverpool, or at the time of the sale, was or was not damaged. The object of the evidence of the condition of the flour, was doubtless to avoid or overcome the remark of the learned Judge who delivered the opinion of the Court of Appeals, that “ the plaintiffs’ flour was a damaged article, and liable to further depreciation if kept on hand,” and the plaintiffs’ counsel insisted that in so far, the case was now varied, and that the question, whether the flour was or was not a damaged article, should have been submitted to the Jury.
But it must be observed that the remark quoted was one, only, of several reasons furnished by the learned Judge, in support of his view that there was no evidence to impute blame to the defendants. He says it was proved that all the large holders of flour were freely selling at the price that then prevailed; that the defendants themselves, sold on the 6th of August, three thousand barrels of their own flour, for a less price than that which they obtained for the plaintiffs; that all the indications were in favor of an abundant domestic harvest; that no immediate improvement in prices was looked for among the dealers in bread-stuffs in that market; that the prices obtained were the market prices prevailing at the time of the sales, and for sometime afterwards, and that the subsequent extraordinary rise was owing to causes wholly exceptional in their character, which were not so far developed when the sales took place as at all to influence the market, and could not have been anticipated with any degree of sagacity.
If it was necessary to take all these reasons in the concrete, and to hold that if any one of them was unsustained by the evidence they all must fail, there would be some *393 pertinence and materiality in the testimony directed to that subject. But I apprehend that the fabric will stand, although one of its supports is taken away.
Assuming that it was proved that the flour was not a damaged article, then that reason of the learned Judge would be gone, but all the others would remain unaffected by any of the new evidence in the case. There was no violation of the written instructions to the defendants, and the burden of proving that the sales were not made in good faith, was upon the plaintiffs. The obligation of the defendants to exercise skill and prudence was the same, whatever was the condition of the flour; and although, if damaged and depreciating in value, the sale might thereby have been hastened, yet proof that the flour was not damaged would not outweigh and overcome all the other and most satisfactory reasons for making the sales at the time they were made. If the plaintiffs were bound to hold the flour, if sound and sweet, then it might be material to inquire how that fact was. But no such obligation rested upon the defendants. They had a right to sell, whether damaged or otherwise, and so long as they can furnish satisfactory reasons for selling, it is quite immaterial what was the condition of the flour at the time.
There was no evidence that “ Wilmer & Smith’s European Times ” was ever read hy any of the defendants. The only one of them examined testified that he never read it, and that, it was not considered authority as to the state of the market. If the article from this newspaper, given in evidence, was calculated to have put the defendants upon inquiry, had they seen it, of to induce the belief that the market was likely to undergo a change, and prices advance, the plaintiffs, nevertheless, cannot have the benefit of such an effect, as indicating a want of good faith by the defendants, without showing that the article, for which such an effect is claimed, came under their observation. The mere circumstance that they were subscribers for and took the papers, is not sufficient to *394 sustain a charge of bad faith. Besides, there was nothing in the article- either to excite the alarm or to change the purpose of any prudent man. It was a communication written at Liverpool for-the paper, and was published at London, on the 4th of August, the day the first sales were made by the defendants. It communicated the fact of the appearance of the potato disease in Ireland, and rumors of its appearance also in England and on the Continent; but in another column of the same paper, the editor speaks satisfactorily of the new wheat crop, and says “ in the meantime large quantities of wheat and flour continue to arrive from the United States and Canada which keep down prices, and render the trade inactive.”
Upon the whole, I have been unable to discover any material variation of the facts proved on the last trial from those which were before the Court of Appeals, and hence there was no error in dismissing the complaint.
Hone'of the exceptions to the rejection or admission of evidence were, well taken. The flour by the Georgiana was not in dispute, and the evidence relating to it or of conversations connected with it were properly excluded. The plaintiffs were seeking to recover for a loss on the flour by the Biddle only, and what was said or done with respect to the Georgiana flour was wholly immaterial. The price of flour in Hew Orleans was unimportant. Its only effect would be as tending to show that the flour was sound and sweet, which, as I have already shown, was of no consequence upon the question at issue.
The letter of the plaintiffs to the defendants of the 15th August, 1846, -was written after the sale, and could have no bearing upon the question of good or bad faith of the defendants, and was properly excluded, as was also the offer to prove by the witness, Robert W. Milbank, that in September, 1846, he learned in Livérpool, that in duly previous the subject of the potato blight was the subject of general conversation among the merchants of Liverpool. It was, at most, mere hearsay evidence, and inadmissible.
The proof offered by the defendants and admitted by *395 the Justice, of the opinions of witnesses as to the effect of the corn law, and of the probable yield of the new wheat crop iipon the price of flour, was proper. The defendants had a right to show any reasons which would tend to justify the sale of the flour, and the opinions of persons competent to judge was calculated to have a marked influence on the minds of those who might be affected by changes in the market. These opinions were drawn out from the witnesses themselves, and the inquiry, therefore, was different from that sought to have been proved by the hearsay testimony of the witness, Robert W. Milbank.
As no error was committed at the trial, the exceptions must be overruled, and the defendants must have judgment, dismissing the plaintiffs’ complaint, with costs.
Robertson, J.
The Court left two questions to the Jury, in this case, on the former trial of it, (1 Bosw., 270,) one was the disobedience by the defendants of the plaintiffs’ instructions in regard to the sale of the flour in controversy ; and the other, the degree of care and diligence exercised on such sale; and the Jury found on both against the defendants. The Court of Appeals, on an appeal from the judgment of this Court, at General Term, held that the facts being undoubted and there being no-conflict of evidence, both such questions were questions of law, and pronounced the defendants, on the evidence, blameless as to both. (21 N. Y. R., 397.) In regard to the first question, that of disobedience of instructions, the testimony was the same on this as on the former trial, and this Court is bound to pronounce upon it as matter of law, that the defendants are equally innocent. The only question before us is whether additional evidence introduced on the trial, having reference to the remaining question of care, diligence or good faith, tends to establish facts calculated so to derange the circumstances from which the Court of Appeals drew its legal conclusions of proper care, diligence and good faith on the former trial, and to add *396 such others, as to leave the whole a proper question for the Jury. Those circumstances, then, were cotemporaneous sales by large holders of flour, including sales by the defendants of their own; indications of an abundant harvest; the opinion among dealers of there being no prospect of an immediate rise; the fairness of the prices obtained; the absence of any such development, at the time of the sale, of the exceptional causes which produced the subsequent rise, as to influence the market, as well as the impossibility of anticipating them by any sagacity. To these was added a danger of depreciation of the flour from its damaged state. ' .
The additional evidence offered consisted of the testimony of two of the plaintiffs, (Eobert and Jeremiah Milbank,) one of the defendants, (William Wood,) the contents of certain circulars of the defendants, and two newspaper paragraphs, contained in a newspaper taken by them. That testimony, it is claimed, showed that the flour was sound, and not damaged; that the weather was so bad as to affect, injuriously, the coming grain crop, and that the potato disease had been known by the defendants to have advanced so far in its career as to be likely to affect the price of flour, of which they were warned by announcements in the newspapers in question.
Ho evidence was adduced on the trial to establish the actual occurrence of weather unfavorable to grain crops likely to produce such injury to the harvests, at the time of the sale by the defendants, as to have induced a man of ordinary forethought to expect such a dearth as to raise the price of flour, or induce dealers in it to expect such rise, although it is well known that very slight elevating or depressing causes are sufficient to affect the price of an article of such certain and universal consumption as bread-stuffs. The plaintiffs never made a failure by the defendants to appreciate the effect of the particular causes, which, subsequent to the sale in question, produced such rise in the price of flour, a subject of complaint until the trial in this action, as will appear by an examination of their *397 conduct, dealings and correspondence with the defendants. They never appear to have stated anything, until this action was brought, but disobedience of such instructions a ground of dissatisfaction.
Kothing in the correspondence of the defendants as introduced by the plaintiffs in evidence, shows any knowledge by the former of weather unfavorable to crops, until their letter of the 18th of August, 1856, after the sale in question, when they state that, “on the 11th or 12th instant a great change for the worse took place in the weather, and the potato crop was completely blighted.” This plainly referred only to the unfavorableness of the weather to the potato crop; but in the circular accompanying such letter they say that, as it has been “wet and unfavorable for securing the wheat crop, we must quote higher prices,” and again, “ the bulk of the new wheat will be of poor quality, and indifferent, if not in bad condition, owing to the wet weather which has been prevailing for the last fortnight.” This, however, would carry the beginning of such wet weather back as far as the 4th of August, when the first sale in question of flour was made by the defendants. In an answer by the plaintiffs subsequently, on the 31st of October, to a letter of the defendants of the 3d of the same month, in which the latter claimed that, when they made the sales in question, “the prospect of a good harvest was before” them, the former not only fail to controvert such statement, but with full information as to the state of the weather, the crop, and the potato blight in August previous, wholly omit to charge any neglect or fraud against the defendants in not perceiving their effect and acting accordingly. They only call for an account therein, not according to subsequent prices, as produced by such bad weather, scanty crops and blight, but according to instructions. This tends strongly to show the charge of misfeasance from such supposed oversight or disregard of the probable effect of such causes to have been an afterthought.
In the letters of the defendants of the 18th of July and *398 3d of August, they speak of the weather as being favorable to grain crops, and of the harvests as already commenced, or to begin in a week or two, and of the prospects of the effect of such forward state of the crops on the. price. A phrase in the letter of the 3d of August that the “market has been at a stand for some days; but, as the last two or three days have been unsettled, there may be possibly some activity to-morrow,” is shown to refer to the state of the market only, and not the weather, by a statement in the circular accompanying it, “that the weather has been remarkably favorable for the grain crops for the last fortnight.”
The information contained in the copies of “Wilmer & Smith’s European Times,” of the state of the weather on the 25th of July and 3d of August, 1846,' produced on the trial, consists of notifying their readers, at the former date, that “the atmosphere had not been unfavorable to the ripening of the crops, which, in that neighborhood, looked well and promised to be abundant,” notwithstanding numerous showers of rain and cool weather; and at the latter date, that although “the weather had been variable,” and “the crops in several parts of the country had been beaten down and injured by’’showers, “no general result could be arrived at, and that arrivals from abroad kept down prices.” Hone of such information would be likely to induce a prudent dealer to await the result of such a harvest in order to obtain better prices.
But there was no evidence of not only the occurrence of any such bad weather in England, before the sales in controversy, as to warrant an expectation in Liverpool of vital injury to the crops in question, but even of any apprehension thereof sufficient to affect the grain market. The existence of fine weather, until about the time of the sale, is testified to by two witnesses, (Harnett and King,) and a favorable prospect of the crops at the same time by one of them, (Harnett,) and one other, (Goodwin,) and there is no conflicting evidence. Hor was there even evidence that any failure or deterioration of crops contributed to produce *399 the rise in the price of the flour, which took place a week after such sale, unless the expression of Mr. Goodwin, as to the defective produce of food in England, is to include grain crops. Every other witness attributed the rise, in his opinion, to the universal devastation produced by the potato disease; and that was admitted by such first witness to be one of the causes. Indeed, there is no evidence before us that there ever was any such apprehension or belief in Liverpool, or elsewhere, at any time, of such a wide-spread destruction of' grain crops as to affect the price of flour in that city. So far as the question of diligence or prudence in the sale was concerned, there was, therefore, clearly no such evidence in the case as to allow, the effect of the bad weather and the failure of crops upon the flour market in Liverpool to go to the Jury upon the points of the failure of the defendants in their duty.
It is, however, also claimed, that on the same point of the prudence of the sale, the case should have gone to the Jury upon the evidence of the existence of a disease in potatoes, and knowledge of it by the defendants at the time of the sale in controversy. The first evidence of any mention of it in this case, is contained in the circular accompanying the letter of the defendants of the 3d of August, 1846, one day before their first sale of any of the flour in question. In it they allude only to the accounts of it from Ireland, which they declare to be alarming, without specifying as to what, but only speak of its commercial effects as having increased the demand for Indian corn. It is very evident they did not infer anything thereby as to its effect upon the. price of wheat flour. And it is very evident that according to the natural course of events, in case of any scarcity arising in the cheapest article of food, its consumers are driven to buy that next above it in price, and so on until those of the most expensive kind are affected. Until the proportion of the supply of Indian corn, or any breadstuff of similar low price, to any demand for it, .increased by the addition of the previous consumers of potatoes, or the diminution of such supply, *400 so enhances the price of it as to induce previous consumers of it to purchase a more valuable article of bread-stuffs, wheat flour would not necessarily feel the effects of a diminution of the potato crop, particularly if only in one country. Even then increased shipments in anticipation of a rise might keep the price the same as stated in the European Times of the 4th of August, already referred to.
The next mention of the potato rot in evidence, is contained in the issue of the European limes on the 25th of July, which is of course not evidence of the facts stated in it. That also alludes to it in Ireland only, giving an extract from a Oork paper which describes its ravages in the county of that name, although it cautiously adds: “ there are complaints of its appearance in England and on the Continent.” By such statement the defendants were surely not bound to know that the extent of the disease in Ireland, England, and on the Continent, was such that it would necessarily affect the price of all kinds of grain successively, until it reached wheat flour, which was certain to rise in price; if they were, they were guilty of imprudence in the sale. To establish that, however, it was necessary to establish three propositions equally important to make out a want of common prudence by the defendants, namely: First, Such destruction of the potato crop, generally, as to compel its consumers to look to Indian com or other cheap grain for a substitute; Second. An insufficient supply of such cereal to meet the wants both of its ordinary consumers and those so driven to its consumption by the scarcity of potatoes, and consequently an inducement held out to some of them to procure as expensive a breadstuff as wheat flour instead; and, lastly, such an insufficient supply of wheat flour to meet the wants of such additional consumers as to raise its price. Hone of these things were shown to have existed at the time of the sale, and the defendants are not chargeable, therefore, with imprudence for not having taken the information given by the Times of the 25th of July, into *401 account. In regard, to the reliability of such information, one of the defendahts, who was a witness for the plaintiff, testified that the paper which contained it was not reliable as to the state of the market, but only for advertisements, and in that point he was not contradicted.
The defendants are not proved to have had any more knowledge -of the extent of the potato disease than was displayed in theip letters. That was not more definite than was already known to the public; and yet all the evidence clearly establishes that it had no effect on the price of flour until the middle of August. The lower priced cereals, such as Indian corn, would, as I have stated, be naturally first and most effected, as is shown by the letters of the defendants of the 3d, and circulars of the 18th of August, 3d and 11th of September, and 3d of October, put in evidence by the plaintiffs. One witness (Goodwin) testified that it appeared at various times, in different districts, and that it occurred late in the autumn of 1846 ; the first rumor of it in Liverpool was at the end of August. Another witness (Harnett) says it began to produce an influence from the 16th to the 20th of August. A third (King) says' that it was known in Liverpool in the middle of August. All concur in fixing the sudden rise in the price of flour at about that time, and attribute it to the disease of the potato. The defendants admit and state that as early as the 11th or 12th of August a great change had taken place in the price of flour, which they also attributed to the same cause. The progress of such events as described seems to be natural. The glut in the flour market first kept prices down, every holder probably struggling to free himself from his load, until the news of the potato disease began to have a slight effect on Indian corn ; the disease, however, remained undeveloped until the bad weather fully disclosed and increased it, when it became widely known. Indian corn rose from thirty shillings a quarter on the 3d of August,, to thirty-three on the 18th.; then sprang to thirty-seven on the 3d of September, and finally culminated in forty-four shillings on the 11th. On the 11th of *402 August, wheat flour first felt the effects of the destruction of the potato, suddenly, other causes perhaps uniting therewith, particularly as previous sales had lightened the market, while the latest holders reaped the benefit of a shorter supply, with a diminished crop of both grain and potatoes.
The additional evidence does not, therefore, vary the view taken of that adduced on the former {¡rial by the Court of Appeals, that the rise in the price of flour subsequent to the sales by the defendant, resulted from exceptional causes, which were not so far developed at the time of the sale as to influence the market, and could not have been anticipated by any degree of sagacity. Of course it will not be contended that knowledge of the appearance of the disease in Ireland alone, or of its devastating effects in one country, and of mere1 rumors of its appearance in England or on the Continent, without any information to its extent, should induce the defendants, as prudent men, to withhold the sale of two cargoes of flour consigned to them in an overstocked and falling market, until the extent of the disease ‘ and its effect on such market should be determined.
After the rise became known, even with the suggestion to the plaintiffs, by the defendants, in their letters, of the potato disease as the cause of the rise, the former still adhered to disobedience to instructions as the sole ground of complaint, and did not impugn the defendants' diligence or prudence by not withholding the sale until the effect of the potato disease was knoAvn, although one of the plaintiffs visited Liverpool and probably investigated the subject; and so little did they dream of fraud that they left a second cargo in the hands of the parties whom they now charge with having sacrificed the first.
The evidence in this case of the quality of the flour, its cost, good stowage, rapidity of transportation and smallness of its product, is immaterial on the question of prudence or negligence in its sale. So also is the amount of expenses incurred, and. the right to have such flour *403 stored for an additional month without any additional expense. Such considerations might weigh with the owner, but would be no justification for delay to sell by a factor. Such charges, if improper, might be resisted. More than one-half of them was for freight, two-sevenths for duties, and four per cent for a commission. They would have been the same on any sale. The flour actually brought within a shilling sterling per barrel ot the very first limits set by the plaintiff’s, and which they subsequently removed.
In reference to the condition of the flour at the time it was sold, one of the plaintiffs (B. Milbank) who, after merely looking at several hundred barrels, only examined from ten to twenty, and tasted and smelled some only of the flour, testified that it was sweet, not sour. The broker who sold the flour, and carefully inspected and examined all of it, declared it to be sour and heated, not fit for baking, and if kept in the condition in which it was when he saw it, likely to deteriorate. The only conflict of testimony seems to be as to the sweetness or sourness of the flour actually tasted by the plaintiff or examined by him; there is none as to the rest being heated, or liable to deteriorate. The Court of Appeals speak of it as being damaged or liable to depreciate; it is immaterial, therefore, whether it was sour or only heated. The evidence does not show these two defects to be the same, and the conflict is not on the point of the liability of the flour to grow more unmarketable, but merely as to the defect which would make it so. The flour was proved to have been sold, in the usual way, in open market, by a broker, who testifies, that “the prices obtained for it were as “ much as it was really ivorth according to the prices of “the day,” on which point he is not contradicted. The presumption of a fair sale is therefore in favor of the defendants. Until that is displaced by circumstances of suspicion, no other evidence of due diligence is necessary. The necessity of a hurried sale, as well as the sale by the defendants of their own flour, on which stress has been *404 laid, are merely rebutting circumstances, and are not rendered indispensable to establish prudence and attention, éven by the occurrence of a subsequent rise of price, unless there was proof also that such increase ought to have been expected by every dealer who paid any attention to occurrences affecting the value of the commodity in which he dealt.
But I do not construe the decision of the Court of Appeals as conceding, or assuming, that when a factor’s discretion in selling goods intrusted to him is unlimited, the mere oversight by him of, or his neglect to give proper weight to, circumstances known to him as having occurred, or which there was reason to believe might occur, sufficient to induce an intelligent and prudent man to delay selling until such circumstances had developed their effect, would alone be evidence of either imprudence or want of diligence. Occurrences happen daily which, ultimately, have an effect upon prices, and which might reasonably be supposed, when known, to be capable of producing such effect, yet, in regard to their probable effect before it is actually produced, great difference of opinion is entertained by equally prudent men. A factor would never dare sell, if a Jury, or even a Court, might subsequently pronounce that he ought to have formed a different judgment as to the future effect of certain occurrences known to him at the time of the sale. Something beyond bad judgment—something not, perhaps, a matter of judgment at all—is necessary to establish fraud or neglect. Undoubtedly, if all the dealers in a commodity abstained from selling in consequence of a universal belief that a certain event had occurred, or would occur, and, in the latter case, a belief upon sufficient grounds, and that it would affect the price of it favorably, it would certainly be the act of a prudent man to wait for its results before selling, and he would be justified in so doing. But it is difficult to perceive that there .could be in contemplation of law any such invincible connection between any event and a future increase of the price of a commodity as to warrant *405 considering a disregard of ifc as an act of imprudence. At all events, it could only impose on a factor the burden of proving his good faith and diligence by the general opinion of dealers. Events have often happened which, when generally known, or while there exist the strongest grounds for a general belief that they would occur, are not believed by any dealer in a particular commodity, or even any of the community, to be likely to affect its price, and which do not immediately have that effect, yet which ultimately produce it. After they have done so every man easily concludes that they naturally would do so, because then they are able to trace the natural and undisturbed course of events. A factor, however, who, in such case, had sold or neglected to sell could surely not be deemed imprudent or negligent. Even the most prudent man will sometimes omit to discover or take into his calculations very disturbing causes in regard to prices. It would, therefore, be clearly unjust to factors for Courts to hold, or allow a Jury to decide, that a connection between any occurrence, or expectation of an occurrence, and a rise in the price of a commodity is so inevitable and universally perceptible by every rational and prudent man as to render any action by him counter to that supposition imprudent or negligent. A sale- made pursuant to the views of all the dealers in an article must certainly be held to be prudent, however imprudent, in the opinion of others, such sale may be, and however contrary to an apparently well founded expectation of a future rise in price. Perhaps extreme cases may be imagined of such great want of judgment as to? leave no room for doubt as to some misconduct having-been committed.
In this case the Court of Appeals, however, held that the sales by the defendant being for the prevailing prices, at which all large holders were selling, including the defendants themselves, with every indication in favor of an abundant harvest, and no immediate improvement,in prices looked for among dealers, (particularly as the flour was likely to deteriorate,) was conclusive evidence of good *406 faith, diligence and prudence in the sale, notwithstanding the occurrence of unusual events, the effect of which on prices was not so far developed at the time of sale as to have influenced the market, and could not have been anticipated by human forethought. The tendency of a commodity to deteriorate would alone justify a sale, notwithstanding the probable future effect on the market for such commodity if it were sound, of the raising of the price subsequently by some other cause. But the state of thing's in this case, whatever was the condition of the flour, was equally conclusive as to the prudence of the sale, and should be held to be so, if the principle of the decision of the Court of Appeals, is to be adhered to.
Being satisfied; therefore, that there was no new evidence in this case bearing on the question of due diligence# and prudence in the sale which at all altered the aspect of the case from that which it bore on the former trial; that there was evidence neither of such bad weather before the sale as to have required the defendants to infer the failure of crops; nor of such knowledge by them of such failure, or of the probable destruction of the potato crop, as to have required them to foresee that prices in the flour market would rise, and to act accordingly; and that the condition of the flour was immaterial on the question of the liability of the defendants; and that they are not proved otherwise to have acted imprudently or negligently; I think the judgment at Special Term should be sustained..
In regard to all other matters but those before treated •of, the evidence has not varied since the former trial, and the decision of the Court of Appeals must, therefore, govern.
Evidence was given on the trial, of the times and prices of the sale of other flour by another vessel (the Georgiana,) for the plaintiffs by the defendants, after that in controversy was sold by them. One of the plaintiffs. (E. Mil-bank) testified that shortly after his arrival in Liverpool, in September, 1846, one of the defendants, (Sellars,) in a conversation with him, regretted the sale, stating it was *407 unfortunate, and hoped the holding of the Georgiana lot and its sale, would bring up the average. The witness then undertook to state something in regard to the last mentioned flour, which he was prevented from stating by the Court, if it only related to expectations or hopes, and not to any reason or explanation of the sale at the time it was made. The plaintiffs’ counsel then offered to prove by the witness that the defendant said that the flour not sold would so bring up the average; that he hoped the witness would assent to the sale of the flour in question which had been so unfortunately made; which was excluded under an exception. Subsequent questions of the same purport were also excluded under a like exception. I do not think there was anything in the evidence offered, bearing on the propriety of the sale in controversy, and it was therefore properly excluded. Proof of the original cost of the flour was immaterial, and properly excluded; notice was given of its value in a letter by the plaintiffs, dated June 30, 1846. Proof that the plaintiffs took the European Times, was immaterial; so also was a question put as to whether a prudent consignee of flour for sale would be led to inquire into the state of weather and crops. That was either a question of law as to his duty, or a conjecture of the witness as to the probable course of a prudent man, neither of which are relevant as' evidence, and the question was properly excluded. Proof of the holding of other consignments by other persons for a better market was not relevant evidence in regard to the propriety of the sale in controversy, and was properly excluded.
Proof on the part of the defendants, that the rise in price of flour, after the sale in question, was not the result of the new corn law, was pertinent on the question of violating instructions. Evidence of the goodness of the prospect of the incoming crop at the time of the sale ; of the time of the knowledge in Liverpool of the potato disease ; of the conformity of the defendants’ conduct to the general opinion and course of dealing in that market; of the full market price obtained; of the anxiety of all hold *408 ers to sell; were all relevant on the question of prudence and diligence in the sale. Testimony to that effect was therefore properly admitted, and the exceptions to it properly overruled.
The motion for a new trial on the exceptions must be denied, and the defendants allowed to ónter up their judgment, with costs.